**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| REMBRANDT VISION TECHNOLOGIES, L.P., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:09-cv-200-TJW |
| | § | |
| JOHNSON & JOHNSON VISION CARE, INC., | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rembrandt Vision Technologies, L.P. ("Rembrandt") filed suit against

Defendant Johnson & Johnson Vision Care, Inc. ("JJVC") for patent infringement of U.S. Patent

No. 5,712,327 ("the '327 Patent"). This Memorandum Opinion and Order outlines the Court's

claim construction for the four disputed terms in the '327 Patent.

**I.      BACKGROUND OF THE TECHNOLOGY**

The '327 Patent is entitled "Soft Gas Permeable Contact Lens Having Improved Clinical

Performance." The invention generally relates to a hydrophilic soft contact lens that has a novel

surface that increases clinical performance. The abstract of the '327 Patent reads:

> A hydrophilic soft gas permeable contact lens having substantially improved
> clinical performance by the provision of a sufficient higher proportion of hydroxy
> acrylic units to silicon units in the lens surface layer, as compared to that existing
> in the lens core, by the surface treatment of the lens, such as by reacting of the
> lens surface with polyols and base or acid or by radiation treatment of the base
> lens to graft, deposit or coat thereon hydroxy acrylic units.

Claim 1, which is asserted in this case and contains the disputed claim construction terms, reads

as follows:

> 1. A hydrophilic soft gas permeable contact lens comprised of a polymerization
> product of a composition comprising a polymerizable vinylic siloxane monomer
> and a hydrophilic vinylic monomer, and having at least 25% water by weight and

1

characterized by high oxygen permeability, softness, rebound elasticity and a high degree of clinical performance, said lens comprising a hydrophilic lens body and a tear-wettable surface layer integral therewith, said lens body being comprised of said polymerization product and said tear-wettable surface layer being comprised of polymeric material containing hydroxy acrylic monomer units, and wherein the proportion of hydroxy acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body.

## II.      GENERAL PRINCPLES GOVERNING CLAIM CONSTRUCTION

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.*  A patent's claims must be read in view of the specification, of which they are a part. *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention.  Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude."  415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id*.  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id*. at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art.  *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id*.  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id*. at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims."  *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In

4

addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316.  Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the PTO understood the patent.  *Id.* at 1317.  Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings.  *Id.*  Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.  *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24.  The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the

specification to be the best guide to the meaning of a disputed term.  *Id.* at 1320-21.  According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."  *Id*. at 1321.  *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter.  *Id.*  What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented.  *Id.*  The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word.  *Id*. at 1321-22.

Phillips does not preclude all uses of dictionaries in claim construction proceedings.  Instead, the court assigned dictionaries a role subordinate to the intrinsic record.  In doing so, the court emphasized that claim construction issues are not resolved by any magic formula.  The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language.  *Id*. at 1323-25.  Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## III.     TERMS IN DISPUTE FROM THE '327 PATENT

### a.  The Three Surface-Related Terms

| Claim Language | Rembrandt's Proposed Construction | JVVC's Proposed Construction[1] |
|---|---|---|
| 1. A hydrophilic soft gas permeable contact lens comprised of a polymerization product of a composition comprising a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer, and having at least 25% water by weight and characterized by high oxygen permeability, softness, rebound elasticity and a high degree of clinical performance, said lens comprising a **hydrophilic lens body** and a tear-wettable **surface layer** integral therewith, said lens body being comprised of said polymerization product and said tear-wettable surface layer being comprised of polymeric material containing hydroxy acrylic monomer units, **and wherein the proportion of hydroxy acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body.** | **"hydrophilic lens body" means:**<br><br>A lens body, which is the interior core portion of a contact lens, having an affinity for and capable of absorbing water. | **"hydrophilic lens body" means:**<br><br>A lens body, which is the interior core portion of a contact lens <u>formed prior to treating the surface</u>, having an affinity for and capable of absorbing water. |
| | **"surface layer" means:**<br><br>A layer beginning from, and including, the outermost surface and moving inward to an arbitrary depth of the lens, and having a different composition from the "body" portion of the lens. | **"surface layer" means:**<br><br>A layer <u>formed after, and as a result of, treating the surface of the "body" portion of the lens,</u> beginning from and including the outermost surface of the lens and having a different composition from the "body" portion of the lens. |
| | **The phrase "wherein the proportion of hydroxyl acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body" means:**<br><br>The proportion of hydroxyl acrylic monomer units to silicon units is higher in the tear-wettable surface layer than in the lens body. | **The phrase "wherein the proportion of hydroxyl acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body" means:**<br><br>The proportion of hydroxyl acrylic monomer units to silicon units is, <u>after treating the surface of the lens body,</u> higher in the tear-wettable surface layer than in the lens body. |

The only material dispute[2] between the parties regarding the three surface-related terms

shown in the table above is whether the Court's claim construction of these terms should include

---

[1] JVVC's constructions are underlined to show the extent that they differ from Rembrandt's proposed constructions and this Court's previous constructions.

the limitation that there must be surface treatment after the lens body formation.  To understand

the dispute, it is important to generally understand the subject of the '327 Patent.  At a high level,

the '327 Patent discloses an invention of an allegedly novel soft gas permeable contact lens.  The

claims of the '327 Patent include claims 1-6, which claim an actual "contact lens" and are

therefore product claims.  '327 Patent, 8:2-33.  Claims 7-14, on the other hand, claim a method

for creating a contact lens and are method claims.  *Id.* at 8:34-10-4.  The terms in dispute in this

claim construction relate to terms in the product claims.

 With respect to the product claims, for example claim 1, it is undisputed between the

parties that the contact lens has two important and distinct structures: (1) a contact lens body and

(2) a surface layer of the contact lens.  Still speaking broadly and at a high level, it is also

undisputed that the surface layer of the contact lens has different properties than the body of the

contact lens.  Indeed, the unique surface on the lens was touted in the specification as part of the

reason for achieving the principal object of the invention.  *See id.* at 2:1-21.  The parties' dispute

begins, however, when JJVC seeks to require the limitation that the contact lens in claim 1 (i.e.,

the product claim) be created according to the method disclosed in the specification.  That is,

JJVC seeks to require the contact lens surface be formed by a surface treatment method after the

contact lens body is formed.  Furthermore, although JJVC describes the additional limitation as a

single limitation, in reality it is two limitations: (1) the surface layer must be formed by *surface

treatment* and (2) the surface treatment must be performed *after* the contact lens body is formed.

Although generally a claimed product is not limited by the process it was made, exceptions may

---

[2] The only other minor dispute is that for the "surface layer" term, JVVC uses the language "beginning from and including the outermost surface of the lens" instead of the language used in Rembrandt's proposed construction and this Court's previous construction, which reads "beginning from, and including, the outermost surface and moving inward to an arbitrary depth of the lens."  The Court rejects the language proposed by JVVC.  The language proposed by Rembrandt, which is the language used by this Court in its previous construction, has support in the intrinsic record.

arise, for example, when the product's distinction from the prior art depends on how it was produced. *Vanguard Prod. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372-73 (Fed. Cir. 2000); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 224 Fed. Appx. 956, 958-59 (Fed. Cir. 2007).

The three surface-related terms in dispute are: (1) "hydrophilic lens body"; (2) "surface layer"; and (3) "wherein the proportion of hydroxyl acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body." This Court has construed these three terms in a claim construction in a previous case. *See Rembrandt Vision Tech., L.P. v. Bausch & Lomb, Inc.*, Civ. No. 2:05-cv-491-TJW, 2007 WL 1481811 (E.D. Tex. May 21, 2007) (Ward, J.). Rembrandt's proposed construction of the three terms is identical to this Court's previous construction of the terms. JJVC's proposed constructions, on the other hand, seek to add language to the Court's prior constructions that is premised on the Court accepting JJVC's argument that the surface layer is limited to a surface layer formed by surface treatment after the contact lens body is formed. If the Court accepts JJVC's argument, then it should adopt all three of JJVC's proposed constructions because all three are essentially premised on the same issue. Because the issue raised by JJVC in this case was not presented to the Court in the previous case, the Court addresses it now. *See Burns, Morriss & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005) (describing that although a previous construction may be instructive and provide the basis of the analysis, particularly when there are new parties and those parties have presented new arguments, the previous construction is not binding on the Court).

### 1. The Parties' Construction Arguments

JJVC spends over half of its claim construction brief arguing why the product claims require the limitation that the lens be surface treated after the lens body is formed. JJVC argues

that the patentee disclaimed all lenses created by any other method.  (Dkt. No. 55, at 10.)  First, JJVC argues that the specification is clear that surface treatment is required after the lens body is formed.  The specification states that "the SGP [soft gas permeable] lens of the invention is made from the known SGP lens compositions and, after lens formation, the lens is then treated to provide its surface a proportion of HAM [hydroxyl acrylic monomer] units to silicon units . . . ." '327 Patent, 4:38-42.  The specification makes similar statements in other places.  In addition, JJVC points out that the specification describes no other method to create the contact lens, and the five embodiments of the invention all use the same method.

Second, JJVC argues that the original prosecution history confirms that the patentee disclaimed all other methods of creating the product except for surface treatment after the lens body formation.  For example, the patentee stated in prosecution history that "[a]pplicants' invention effects a treatment of such lenses so that they present a surface layer . . . ."  (Apr. 24, 1992 Response to Mar. 26, 1992 Office Action, at 7, attached as Ex. 2 to Dkt. No. 55, at REMJJ073687.)  There are other similar statements in prosecution history.  Furthermore, at one point in prosecution, the patent examiner imposed a restriction requirement because "[i]n the instant case the product can be prepared by another and materially different process" and the examiner required the patentee to make an election.  (Mar. 8, 1993 Office Action, at 2, attached as Ex. 3A of Dkt. No. 55.)  The patentee responded and elected the process claims but traversed the restriction requirement because "no basis exists for the Examiner's assertion that the claimed contact lens product . . . can be made from any other materially different process than that set forth in the process claims."  (Apr. 15, 1993 Response to Mar. 8, 1993 Office Action, at 2, attached as Ex. 3B, Dkt. No. 55.)

Finally, JJVC argues that in Reexamination Rembrandt reiterated that the product claims "require" surface treatment.  For example, in Reexamination, Rembrandt stated:

> Thus, based on the state of the art in 1979, neither using a hydrophilic silicone hydrogel lens body nor treating the surface of such a lens body with a HAM would have been suggested to the skilled artisan.  Both of these characteristics are required by Changs' claims (*see, e.g.*, claim 1).

(Mar. 2, 2009 Reexamination Response to Office Action, at 14, attached as Ex. 4B to Dkt. No. 55.)

Rembrandt's response can be briefly described as arguing that the neither the specification nor prosecution history show a clear disclaimer as required by Federal Circuit law.

## 2.  Analysis

The Court does not find a disclaimer and agrees with Rembrandt to adopt the same constructions that this Court adopted in its prior construction.  The Federal Circuit has cautioned that "limitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper."  *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (citing *Intervet Am., Inc. v. Kee-Vet Labs.*, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989)) (internal quotes omitted).  "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex* at 1327).  Regarding prosecution history, to be a disclaimer, the statement in prosecution history must be clear and unambiguous and constitute a clear disavowal of the scope.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007).  In addition, the prosecution history is often less informative than the specification.

*Phillips*, 415 F.3d at 1315.  Finally, "[a] novel product that meets the criteria of patentability is not limited to the process by which it was made." *Vanguard*, 234 F.3d at 1372.

First, the specification contains no clear intention to limit the product claim scope to lenses created with a surface treatment process after the lens body formation.  While the specification describes no other method or embodiment, Federal Circuit law is clear that this is not enough to find a disclaimer.  Furthermore, JJVC's argument on page 14 of its brief that "the specification repeatedly disparages prior art SGP lenses whose surfaces have not been treated" is a misleading attempt to find a disclaimer by mixing attorney argument with pieces of quotes.  (Dkt. No. 55, at 14.)  Nowhere in the specification does the patentee criticize prior art lenses for the lack of the surface treatment step.  The most that can be said is that the patentee criticized prior art lenses for lacking the *surface layer* of the '327 Patent lens, but that is much different that criticizing other prior art lenses for lacking *the step of surface treatment after lens body formation*—the latter being the limitation JJVC seeks to impose.  In addition, the "summary of the invention" section of the '327 Patent describes that the "principal object of the invention" is achieved by the lens itself, which contains a unique surface layer, but not *the method* of creating that surface layer.  *See* '327 Patent, 2:7-20.  Then, after describing the novel lens that constitutes the invention, the '327 Patent states that the surface layer "*can be* attained by surface treatment." *Id.* at 22-23 (emphasis added).

Second, there is no clear and unambiguous disavowal of the claim scope in the prosecution history.  The hand-picked quotes that JJVC argues are disclaimers in the prosecution history are ambiguous at best.  Insofar as JJVC's argument regarding the Examiner's restriction requirement is concerned, the patentee's statements relating to the restriction are also ambiguous at most.  M.P.E.P 806.05(f) describes that the Examiner may enter a restriction requirement

when "the process as claimed can be used to make another materially different product."  After the Examiner entered the restriction requirement, the patentee only noted, when traversing the restriction requirements, that the Examiner has presented no reason (i.e., no basis) for the product vs. process restriction requirement.  (*See* Apr. 15, 1993 Response to Mar. 8, 1993 Office Action, at 2, attached as Ex. 3B, Dkt. No. 55 ("*[N]o basis exists* for the Examiner's assertion that the claimed contact lens product . . . can be made from any other materially different process than that set forth in the process claims.") (emphasis added).)   In addition, the patentee never technically agreed that the product and process claims were the same in order to withdraw the restriction requirement; instead, the patentee only agreed "that if the Examiner finds one of the inventions unpatentable over the prior art, such finding or evidence may be used in a rejection under 35 U.S.C. § 103 of the other invention."  (Nov. 30, 1994 Response to Aug. 18, 1994 Office Action, at 1, attached as Ex. 3C to Dkt. No. 55.)   In other words, the patentee agreed that the Examiner would not have to expend twice as much work for the issuance one patent, that is, if the product claim is found to be obvious then the Examiner could therefore find the process claim to be obvious.   *See* M.P.E.P. 803 Restriction – When Proper ("If the search and examination of all the claims in an application can be made without serious burden, the examiner must examine them on the merits, even though they include claims to independent or distinct inventions.").

Rather than supporting an intentional disclaimer, the prosecution history has support that the patentee believed his "invention" was the contact lens itself (i.e., the product), and not only the method to create the contact lens.   At one point in the original prosecution history, the patentee states:

> In claiming the **novel lens** (see, e.g., Claim 20 [which was issued as current Claim 1]), it is to be recognized that the entire lens per se is a hydrophilic SGP-type lens,

> i.e., being comprised of a polymerization product of a composition comprising polymerizable vinylic siloxane monomer and hydrophilic vinylic monomer, and have a water content of 25% by weight or greater.  The overall lens can be considered as comprised of a "body" portion and a "surface layer" which surrounds and is integral with the body portion.  The body portion is comprised of the earlier-mentioned polymerization product when is characteristic of a hydrophilic SGP lens, such that the overall lens is seen to be a hydrophilic SGP lens.  **In distinction from the prior art, the composition of the surface layer differs from that of the lens body portion** in that it contains a higher hydroxyl acrylic monomer unit to silicon unit ratio or proportion than exists in the body portion.  For reasons noted above, **this renders the surface layer more tear-wettable and brings about the improvement in clinical performance.**

(Apr. 24, 1992 Response to Mar. 26, 1992 Office Action, at 7-8, attached as Ex. 2 to Dkt. No. 55 (bold emphasis added, underline in original).)  In the above quote, the patentee makes clear that it is the lens itself, not the method of creating the lens, that is novel.  Furthermore, the patentee distinguishes the prior art on the basis that the '327 Patent lens has a unique surface layer—not that the surface layer is created from a surface treatment after the lens body is created.  Therefore, it would be improper to add limitations from the method into the product claim because it was the product itself that was novel—not just the method.  Of course, later in that same piece of prosecution history, the patentee states that "applicants' treatment of the basic hydrophilic SGP lens has the result that the composition of the surface of the lens is altered relative to the rest of the lens."  (*Id.*)  JJVC's reliance on statements such as this, taken out of context, is insufficient to show a clear and unambiguous disclaimer.  This statement can easily be read as the patentee only stating that the patentee's surface treatment method can result in the novel contact lens that it claims in its product claim.  In any event, even if surface treatment of the lens after the lens body is created is the only method the patentee knew that would create the product the patentee claimed, the patentee's product claim can still cover products created by later discovered methods so long as those products fall within the scope of the patentee's product claims.  *See Innogenetics, N.W. v. Abbott Labs.*, 512 F.3d 1363, 1370-71 (Fed. Cir. 2008) ("Our

14

case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.").

Additionally, there is no clear and unambiguous disclaimer in the prosecution history created in Reexamination. As JJVC notes, the patentee did state:

> Thus, based on the state of the art in 1979, neither using a hydrophilic silicone hydrogel lens body nor treating the surface of such a lens body with a HAM would have been suggested to the skilled artisan. Both of these characteristics are required by Changs' claims (*see, e.g.*, claim 1).

(Mar. 2, 2009 Reexamination Response to Office Action, at 14, attached as Ex. 4B to Dkt. No. 55.) This statement is also not an unambiguous disclaimer. This statement is partially taken out of context. The previous sentence discusses how Peyman (prior art) discouraged the use of "hydrogel lens bodies" and "HAM units to coat the surface." *Id.* Given this context, the quote pointed out above by JJVC could be read as stating that these "characteristics" (i.e., the "hydrogel lens bodies" and "HAM units to coat the surface" discouraged by Peyman) are required by Changs' claims, including claim 1. But it is undisputed by Rembrandt that the claims may require a surface layer of HAM units. This is different, however, than requiring that surface layer to be formed by surface treatment after the contact lens body is formed.

Finally, although JJVC describes its proposed additional limitation as a single limitation, in reality it is two limitations: (1) the surface layer must be formed by *surface treatment* and (2) the surface treatment must be performed *after* the contact lens body is formed. Most of JJVC's argument and support is based on statements merely stating that "surface treatment" may be a required step. There is even less support, however, for the limitation that this surface treatment must be performed *after* the contact lens body is formed. Therefore, even if the Court found that the patentee disclaimed all other methods besides a lens created by surface treatment, which it

does not, the Court still would not necessarily find that this step must be performed *after* the contact lens body was formed.

In conclusion, the Court agrees with Rembrandt and adopts the following constructions:

- "hydrophilic lens body" is construed as "*a lens body, which is the interior core portion of a contact lens, having an affinity for and capable of absorbing water.*"

- "surface layer" is construed as "*a layer beginning from, and including, the outermost surface and moving inward to an arbitrary depth of the lens, and having a different composition from the 'body' portion of the lens.*"

- The phrase "wherein the proportion of hydroxyl acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body" is construed as "*the proportion of hydroxyl acrylic monomer units to silicon units is higher in the tear-wettable surface layer than in the lens body.*"

b.  **"high oxygen permeability"**

| Claim Language | Rembrandt's Proposed Construction | JJVC's Proposed Construction |
|---|---|---|
| 1. A hydrophilic soft gas permeable contact lens comprised of a polymerization product of a composition comprising a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer, and having at least 25% water by weight and characterized by ***high oxygen permeability***, softness, rebound elasticity and a high degree of clinical performance, said lens comprising a hydrophilic lens body and a tear-wettable surface layer integral therewith, said lens body being comprised of said polymerization product and said tear-wettable surface layer being comprised of polymeric material containing hydroxy acrylic monomer units, and wherein the proportion of hydroxy acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body. | **"high oxygen permeability" means:**<br><br>Having an oxygen permeability of about 25 barriers and higher and in no event does this term require a Dk measurement of more than about 32 barriers. | **"high oxygen permeability" means:**<br><br>Having an oxygen permeability of about 4 to 5 times higher than that of the conventional poly HEMA soft lens. |

This Court did not construe the term "high oxygen permeability" in the previous claim construction.  Rembrandt seeks a construction that reads "having an oxygen permeability of about 25 barriers and higher and in no event does this term require a Dk measurement of more than about 32 barriers."  JJVC seeks a construction that reads "having an oxygen permeability of about 4 to 5 times higher than that of the conventional poly HEMA soft lens."  The Court construes the phrase similar to Rembrandt's construction but excludes the latter half of Rembrandt's construction because it is unnecessary.  The term "high oxygen permeability" is construed to be "having an oxygen permeability of 25 barriers or higher."

### 1.  The Parties' Construction Arguments

JJVC argues that the '327 Patent defined "high oxygen permeability" when it stated that "[t]he lens thus made has high DK, about 4 to 5 times higher than that of the conventional poly

17

HEMA soft lens." '327 Patent, 6:21-22. The term DK is used synonymously with permeability to oxygen in the art. *See id.* at 1:19-21 (stating one property of contact lenses is their "permeability to oxygen (commonly referred to as DK)"). Therefore, JJVC argues that its proposed construction is correct because it tracks the definition in the specification.

Rembrandt disagrees that the '327 Patent was defining "high oxygen permeability" when it stated that "[t]he lens thus made has high DK, about 4 to 5 times higher than that of the conventional poly HEMA soft lens." *Id.* at 6:21-22. Instead, Rembrandt argues that "high oxygen permeability" should be defined by considering the types of lenses the '327 Patent considered to have high oxygen permeability. In the background of the '327 Patent, the patent mentioned several prior art lenses that contained "excellent oxygen permeability." *Id.* at 1:62-63. One of these was U.S. Patent No. 7,711,943 ('943 Patent). The '943 Patent described a contact lens material having "high oxygen permeability" with a DK of at least 25 barriers. '943 Patent, 3:53-57; 41:2-3. Therefore, Rembrandt argues this should be low end of the "high oxygen permeability" range.

### 2.  Analysis

The '327 Patent was not defining the term "high oxygen permeability" when it stated "[t]he lens thus made has high DK, about 4 to 5 times higher than that of the conventional poly HEMA soft lens." '327 Patent, 6:21-22. At most, the patent was only stating that the example it was discussing had a high oxygen permeability because it had a DK 4 to 5 times higher than a conventional HEMA soft lens. This only means a lens having a DK of 4 to 5 times higher than a conventional poly HEMA soft lens is definitely considered to have "high oxygen permeability," according to the '327 Patent. This does not mean, however, that the term "high oxygen permeability" is limited to those lenses with a DK range of 4 to 5 times higher than a

conventional HEMA soft lens.  Therefore, the Court rejects JJVC's proposed construction as it potentially adds a limitation that is not required by the '327 Patent.  In addition, JJVC's proposed construction is problematic because it invites additional argument at trial regarding the DK value of a conventional poly HEMA soft lens because JJVC's proposed construction is dependent on that value.  It appears from the briefing the parties disagree on the DK value of a conventional poly HEMA soft lens, so JJVC's construction would not provide a clear meaning of "high oxygen permeability" and the jury would have to decide who to believe regarding the proper DK value of a conventional poly HEMA soft lens (i.e., the jury would essentially be partaking a task similar to claim construction).  Determining the meaning of the claim terms, however, is the duty of the Court, not the jury.

Rembrandt's construction, on the other hand, provides a clearer construction, and the construction is supported by the specification of the '327 Patent.  The term "high oxygen permeability" is obviously a relative term and indicates a likely range of values that would be considered "high."  Rembrandt's construction provides a clear floor to that range—25 barriers. Above the Court criticized JJVC's construction for providing an unnecessary limitation to the term "high oxygen permeability."  Although Rembrandt's proposed construction also adds a strict limitation to the phrase, this limitation has support in the specification and the parties at least agree[3] that the lower limit of the range should not be lower than 25 barriers.  As Rembrandt points out, the '327 Patent lists several prior art SGP lenses that had high oxygen permeability.[4]

_____

[3] JJVC does not agree to Rembrandt's construction; however, JJVC argues the lower end of the "high oxygen permeability" range should be higher than 25 barriers, so JJVC would undoubtedly agree that the lower end of the range should *not be lower than* 25 barriers.

[4] Although the '327 Patent explicitly states that those lenses had "excellent oxygen permeability," it is clear that the patentee used the words "high oxygen permeability" to include those lenses with "excellent oxygen permeability."  '327 Patent, 1:55-2:7.  This is clear because the paragraph where the '327 Patent discusses the prior art SGP lenses with "excellent oxygen permeability" is followed by the next paragraph that discusses how the '327 Patent lens is an

As discussed above, the '943 Patent is one of the prior art lenses listed, and the '943 Patent described a lens with "high oxygen permeability" with a DK of 25 barriers. '943 Patent, 3:53-57; 41:2-3. The '327 Patent specification agreed that this prior art lens had a high oxygen permeability. Therefore, the term "high oxygen permeability" should have a lower limit of no higher than 25 barriers because if not, such a definition would exclude an exemplar lens that the '327 Patent described as having high oxygen permeability. Because the parties do not argue the range should be any lower, the Court will allow the lower limit of the range to be 25 barriers. On the other hand, there is no clear limitation in the specification of an upper limit to the term "high oxygen permeability," so the Court leaves the upper limit open-ended.

The latter portion of Rembrandt's proposed construction that reads "in no event does this term require a Dk measurement of more than about 32 barriers" is unnecessary. Because the first part of the construction identifies a lower limit but has no upper limit for the range of "high oxygen permeability," there is no need to point out that the term does not require a measurement of more than 32 barriers. Therefore, the term "high oxygen permeability" is construed as "*having an oxygen permeability of 25 barriers or higher*."

---

improvement over the prior art SGP lenses because it "not only possess[es] a high degree of oxygen permeability" but also includes other advantageous features. *Id.* Thus, the '327 Patent is implying in this second paragraph that the SGP lenses in the previous paragraph had "a high degree of oxygen permeability." *Id.*

### c.  "hydrophilic"

There is some dispute regarding whether the term "hydrophilic" should be construed. Rembrandt argues the term should mean "having an affinity for and capable of absorbing water." JJVC argues that construction is not necessary because the term "hydrophilic" is subsumed in the term "hydrophilic lens body," and the Court's construction of "hydrophilic lens body" should provide sufficient context for the term "hydrophilic."  JJVC does not dispute the accuracy of Rembrandt's proposed construction of "hydrophilic"—JJVC only argues that it is unnecessary. In this Court's previous construction, it did not construe "hydrophilic" independently. *Rembrandt*, 2007 WL 1481811, at *4-5.  But it is undisputed that Rembrandt's proposed construction is at least accurate, therefore, the Court adopts Rembrandt's construction of "hydrophilic" to be "*having an affinity for and capable of absorbing water.*"

### d.   Claim 7 Terms

Rembrandt asks the Court to construe terms appearing in claim 7.   As JJVC correctly points out, Rembrandt has never asserted that claim against JJVC and so the Court should not construe them because the claim is not in controversy.   The Federal Circuit has held that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."   *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).   The Court refuses to construe the disputed terms of claim 7 because claim 7 is not asserted at this time.

IV.     **CONCLUSION**

The Court adopts the constructions set forth in this opinion for the disputed terms of the '327 Patent.   The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.   Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.   Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

It is so ORDERED.

SIGNED this 28th day of April, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE