### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

REMBRANDT VISION
TECHNOLOGIES, L.P.,

                    Plaintiff,

vs.                                                       Case No. 3:11-cv-819-J-32JRK

JOHNSON & JOHNSON
VISION CARE, INC.,

                    Defendant.
_____

## ORDER

During the trial of this patent case, plaintiff's expert, Dr. Thomas Beebe, testified for the first time on cross-examination that he had followed an undocumented protocol for his Shore D testing that is entirely inconsistent with the procedures disclosed in his expert report. This caused defendant Johnson & Johnson Vision Care, Inc. ("JJVC") to make an *ore tenus* motion to exclude Dr. Beebe's testimony regarding his Shore D testing and for judgment as a matter of law under Rule 50(a). The parties submitted briefing on this issue (Docs. 265, 266, 274), and oral argument was held on May 4, 2012, May 11, 2012, and May 14, 2012, the transcripts of which are incorporated by reference (Tr. Trans. Vol. VI at 39-93; Tr. Trans. Vol. X at 5-108; Tr. Trans. Vol. XI at 16-56).   On May 14, 2012, the Court ruled on the record that it would grant JJVC's motion to strike Dr. Beebe's Shore D testimony and for judgment as a matter of law under Rule 50(a).  (Tr. Trans. Vol. XI at 51.) This Order constitutes the Court's reasoning for that ruling, as well as its ruling on the issue of willful

infringement.[1]

## I.    BACKGROUND

Rembrandt alleges that JJVC's  Acuvue Advance and Acuvue Oasys contact lenses

infringe United States Patent Number 5,712,327 (the "'327 patent").  The '327 patent claims

a "soft gas permeable contact lens" containing certain properties.  At the joint request of the

parties, the Court construed the term "soft gas permeable contact lens" to mean "a contact

lens having a Hardness (Shore D) of less than five."  (Doc. 69 at 2.)

Rembrandt retained Dr. Thomas Beebe to determine the Shore D hardness of the

accused products.  In his expert report, Dr. Beebe stated that he used the following standard

operating procedures:

> 1.  A Shore-D durometer . . . was used for all hardness testing. . . .
> 2.   The sample must be thick enough to allow full penetration of the probe through the material to be tested.  The probe is 0.100 inch (2.54 mm) in length.
> 3.  When the sample is thinner than this (as is the case with contact lenses), individual pieces of the sample must be stacked on top of each other in order to provide the required sample thickness.
> 4.  The lenses were removed from their packaging and carefully stacked on a stainless steel ball having a curvature that matched the curvature of the lenses. . . . Stack 24 individual lens samples on each other, keeping the material hydrated in its original packaging fluid.
> 5.  Locate the durometer probe at the location on the sample to be tested and slowly press the probe into the sample stack.  Stop advancing when the durometer bottoms out.
> 6.  The durometer was pressed into the test stack of

---

[1] At the conclusion of the evidence, the Court granted JJVC's *ore tenus* Rule 50(a) motion for judgment as a matter of law with respect to Rembrandt's claim of willful infringement.  (Tr. Trans. Vol. VI at 92.)

> lenses in sets of 10 replicates, each at a different location. . . .
> 7.  Lenses were discarded after testing.  All lens boxes
> with lot information were retained in a lab notebook.

(Doc. 265, ex. 2 at 46-47.)

Pretrial, JJVC moved to exclude Dr. Beebe's testimony under <u>Daubert v. Merrell Dow</u>

<u>Pharms., Inc.</u>, 509 U.S. 579, 592–93 (1993), and for summary judgment on the grounds that

no reasonable juror could conclude that the accused products are "soft" based on Dr.

Beebe's testing. (Docs. 148, 152 at 27-34.)  JJVC primarily argued that Dr. Beebe should

have tested a dehydrated button of material rather than hydrated contact lenses.  JJVC also

argued that Dr. Beebe's testing procedures did not conform to the governing scientific

standards.  The Court denied the motion for summary judgment; at the joint request of the

parties, the Court deferred ruling on the <u>Daubert</u> motion until after Dr. Beebe testified at trial.

(Docs. 237, 255.)

At trial, Dr. Beebe testified on direct examination that he performed his Shore D

testing consistent with the procedures listed in his expert report.  Specifically, Dr. Beebe

stated that, when he conducted his testing, "other than the fact that [the lenses] were

stacked up, they were as they come out of the case."  (Tr. Trans. Vol. III at 56.)  He also

testified that his testing was consistent with the testing he performed during the

reexamination of the '327 patent and in prior litigation, (<u>id.</u>) and such testing was similar to

that disclosed in his expert report.

On cross-examination, Dr. Beebe had difficulty articulating how he designed his Shore

D test.  He conceded that he had only performed Shore D testing in the context of litigation

for Rembrandt and that he was not an expert on Shore D testing.  (Tr. Trans. Vol. III at 231-

32.)[2] Dr. Beebe also stated that he "didn't really refer to the patent in deciding how to do [his] testing" and that he had not attempted to determine how the inventor had conducted Shore D testing. (Id. at 232-33.) He further stated that, when he designed his test, he had not reviewed the patent office file history. (Id. at 236.) While Dr. Beebe asserted that he had looked at scientific standards for measurements, he stated: "I can't recall whether I looked at the ASTM or the ANSI [standards]. The acronyms are similar. I looked at *one* of the standards." (Tr. Trans. Vol. III at 237)(emphasis added).

JJVC then asked a series of questions designed to show that Dr. Beebe's procedures, as disclosed in his expert report, did not conform to the governing scientific standards. At first, Dr. Beebe attempted to defend his written procedures; however, he had difficulty explaining how they met the standards. For example, when asked why he chose to test a stack of contact lenses rather than a button or blank of contact lens material, Dr. Beebe gave an implausible reading of the standards, opining that perhaps a "comma" was missing from the standards, which would alter their meaning. (Id. at 240.) JJVC next inquired into

---

[2] The following exchange took place:

> Q. And I think it's fair to say that Shore D testing is not something you do in your work as a research scientist; is that right?
> A. Correct
> Q. It's something you've basically only done for Rembrandt, right?
> A. Yes.
> Q. So you wouldn't call yourself an expert in Shore D testing?
> A. Yes.
> Q. That's correct? You're not an expert on Shore D testing?
> A. Okay. Yes.

(Tr. Trans. Vol. III at 231-32.)

whether Dr. Beebe tested a sample of the appropriate thickness:

> Q. You testified something was 6 millimeters thick?
> A. Yes.
> Q. What was that?
> A. That was the stacked-up lenses that were stacked up in order to achieve a minimum thickness of 6 millimeters.
> Q. Whoa. I thought you said in your report that you stacked 24 lenses.
> A. Okay.
> Q. Is that true? Here's your expert report. . . .  The sample must be thick enough to allow full penetration of the probe, and that's 2.54 millimeters, right?
> A. Yes. And I believe that's a mistake, actually. I think that — I think the actual — *that might be a typo*. The correct value is one — one-quarter of an inch...
>    . . .
> Q. How on earth do 24 lenses add up to 6 millimeters? . . . Oasys [has a] center thickness [of] .07.
>    . . .
> Q. And my math tells me that 24 times .07 is 1.68 millimeters. Does that sound about right?
> A. That math sounds right, yes.
> Q. Okay. So you had 24 lenses, and they didn't come close to 6 millimeters, did they?
> A. Yes, they did. I actually measured that with a micrometer.
> Q. Your report, of course, says it came up to 2.54 [millimeters]. And that's just wrong?
>    . . .
> A. . . . I'm saying that I think the correct numbers are 6 millimeters and one-quarter of an inch.
> Q. Okay.
> A. And I tested that with a micrometer caliber as I was stacking them up to make sure that was the case. *I think this might be a typo.*

(Id. at 240-43.) After unsuccessfully trying to explain how his sample had the appropriate

thickness, Dr. Beebe began to change his account of his testing protocol:

> Q. But you stacked 24 lenses, right? That's — that's not a typo, is it?
> A. That's not a typo.

> Q.      And you stacked —
> A.      Well, I don't know if it's a typo. I stacked the number of
>         lenses required to get a 24 — rather, the required 6
>         millimeter sample height —

(Id. at 243.)[3]

JJVC next asked Dr. Beebe how he complied with the requirement in the standards

that samples be flat:

> Q.      And, of course, the contact lenses aren't flat, right?
> A.      That's correct.
> Q.      So setting aside whether you did 6 millimeters or didn't do
>         6 millimeters, you certainly didn't have flat samples,
>         correct?
> A.      That's not correct. I disagree.

(Id. at 245.)

Unable to explain how his written procedures complied with the standards, Dr. Beebe

suddenly changed course in the middle of cross-examination and testified that he did not

follow the procedures listed in his expert report.   Instead, he claimed that he forgot to

mention that the testing procedures he actually used were markedly different from those

disclosed in his expert report:

> A.      I — I — now I think I know what — what I'm not
>         remembering.
> Q.      Okay.
> A.      So the lens — I cut the lens into quarters and
>         stacked those quarters up, and I cut 24 lenses into
>         quarters, and that's what I tested. And I made sure that
>         it was more than 6 millimeters.
> Q.      Let's take a look — that doesn't appear anywhere in
>         your standard operating procedures, does it?
>         . . .
> Q.      Is something missing here? You didn't tell us what

---

[3] Dr. Beebe also acknowledged that, to be compliant with the standards, it was important that his sample be at least 6 millimeters thick.  (Id. at 246.)

Q.    you did?

A.    There was a step where I — *in order to make them flat* — you can't make a curve — an accurate measurement on the curved lenses, as you pointed out a minute ago. So the lenses were quartered and stacked so I could make them flat.

Q.    You didn't think you should tell us that?

A.    It's not that I'm hiding it, but I just told you I — that . . .
. . .

Q.    Right. Because how can you — how could you — sir, your report says you stacked them on a stainless steel ball having the curvature that matched the curvature of the lenses.  Is this some other experiment you're telling us about?

A.    That's — *that's a typo, yes.* That's not what I — that's not how I made the measurements.

Q.    Okay. So you didn't carefully stack them on a stainless steel ball having a curvature that matched the curvature of the lenses; you cut them into quarters and stacked them up?

A.    On an aluminum plate, that's right.
. . .

Q.    Okay. So is it fair to say that more or less this is a standard that you made up of cutting the lenses and stacking them up?

A.    The part about cutting in order to stack them up is something that I did *in order to achieve what the standard says you need for the minimum thickness.*

(Id. at 247-50)(emphasis added). Therefore, while Dr. Beebe's expert report stated that he tested 24 whole contact lenses with a thickness of not less than 2.54 millimeters on a curved steel ball, he now testified that he had cut the 24 lenses into quarters and stacked as many as needed on an aluminum plate to reach a height of six millimeters.  Dr. Beebe gave two explanations for his new procedures: cutting the lenses into quarters produced a flat surface; and, cutting the lenses allowed him to achieve a minimum thickness of 6 millimeters (though he later testified that he had an unlimited number of lenses).

Dr. Beebe also testified that he had no documentation to support the new procedures he claimed to have employed:

> Q.     Okay. And so far at least, we're just trusting you on the 6 millimeters. It's not — so far we haven't seen it in your records?
> A.     As you are trusting me as I testify here, yes.
> Q.     Okay. And, lastly, you took a video, as I recall, of your microtoming procedure, right?
> A.     Yes.
> Q.     But you didn't provide even a photograph of your stack of lenses, did you?
> A.     No.
> Q.     So we don't really know what it is you tested or what they looked like, do we?
> A.     Well, I'm testifying here, telling you that I tested a stack of quartered contact lenses out of the case, so that's what I tested.

(Tr. Trans. Vol. III at 250-51.)

On re-direct, Dr. Beebe provided no further explanation for his departure from the procedures listed in his expert report.  Instead, when asked why he had not disclosed that he cut the lenses, Dr. Beebe stated: "[if] I had it to do over again I would have included that detail.  I just forgot to put it in."  (Tr. Trans. Vol. IV at 13.)

During re-cross examination, Dr. Beebe acknowledged that his lab notebook also did not mention cutting the lenses, having a sample of 6 millimeters in thickness, stacking the lens pieces on an aluminum plate, or any of the other procedures that Dr. Beebe had mentioned for the first time on cross-examination.  (Tr. Trans. Vol. IV at 46.)  Dr. Beebe thus testified that a scientist reviewing his work would not be able to reproduce his testing methodology:

> Q.     Okay. So any scientist trying to understand what you did

8

> based on the written record rather than your oral
> testimony — your written record says you took 24 lenses
> and stacked them up on a curved ball, right?
>
> A.      Yes, if you put it all together.

(<u>Id.</u> at 46.)  However, Dr. Beebe agreed that it is important to "good science to accurately record what it is you're doing." (<u>Id.</u> at 44-45.)  Dr. Beebe also acknowledged that a scientist who read the standard operating procedures from his expert report would realize that they are not consistent with the applicable scientific standards.  (<u>Id.</u> at 41.)

After the completion of Dr. Beebe's testimony, JJVC moved to exclude his testimony regarding Shore D testing under <u>Daubert</u>. (<u>Id.</u> at 77-81.)  Rather than hear a response from Rembrandt, the Court scheduled argument on this issue, which occurred at the conclusion of Rembrandt's case-in-chief. (<u>Id.</u> at 81-82.)  Both parties filed briefing on the Shore D issue prior to the argument. (Docs. 265, 266.)  At the argument, JJVC moved to strike Dr. Beebe's testimony under both <u>Daubert</u> and Federal Rules of Civil Procedure 26 and 37.  JJVC further moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) because, if Dr. Beebe's testimony was excluded, Rembrandt would have no evidence to meet its burden of proof on the "soft" claim limitation. (Doc. 265.)  JJVC also moved for judgment as a matter of law under Rule 50(a) on the issue of willful infringement.  (Tr. Trans. Vol VI at 5-93.)

At argument, when the Court asked Rembrandt what it would tell the jury regarding Dr. Beebe's Shore D testing, Rembrandt's counsel stated:

> I can only live with the testimony he gave, Your Honor. His
> testimony is that he did it the way he said he did it.  I -- I have no
> basis to say that that's not true. . . . I'm going to say that Dr.
> Beebe got extremely flustered on cross under a very vigorous

> cross. . . . His testimony was not clean by any way, shape, or
> form, but his test results are reliable.

(Id. at 74-75.)  The Court deferred ruling on JJVC's motion to exclude Dr. Beebe's testimony until the conclusion of the liability phase of trial. (Tr. Trans. VI at 91-92.)  However, the Court granted JJVC's Rule 50(a) motion with respect to willfulness, and thus did not permit Rembrandt to argue willful infringement to the jury.  (Id.)

At the close of the evidence, JJVC  renewed  its motion to exclude Dr. Beebe's Shore D testimony.  The Court continued to defer ruling. (Tr. Trans. Vol. IX at 134.)

During closing, Rembrandt told the jury that the differences between Dr. Beebe's expert report and his testimony at trial did not affect the reliability of his results.  Rembrandt stated:

> So you have to ask yourself this question as you sit there and
> listen to some of the criticisms [of Dr. Beebe] and ask yourself:
> Does this one — does this one really matter on this one? And
> only you can answer that question, but the expected value of
> any kind of testing on the Shore D is zero.

(Tr. Trans. Vol. IX at 187.)  Rembrandt then referred the jury to Shore D testing that Dr. Beebe had conducted on other contact lenses during a reexamination of the '327 patent and asserted: "as you can see, it doesn't matter how you stack them, where you test them, the result is zero.  It's what you expect and that's the results you get."  (Id.)   Rembrandt thus essentially told the jury that it could disregard any flaws in Dr. Beebe's methodology or the change in his testimony because "the expected result" was a Shore D value of less than 5.

The Court conducted another lengthy hearing after the case was submitted to the jury, (Tr. Trans. Vol. X at 1-108) and Rembrandt filed a supplemental memorandum (Doc. 274).

10

After the jury returned a verdict of non-infringement, the Court announced that it would alternatively grant JJVC's motion to strike Dr. Beebe's Shore D testimony and for judgment as a matter of law under Rule 50(a).  (Tr. Trans. Vol. XI at 51-52.)[4]

## II.    STANDARD OF REVIEW

In this patent case, this Court applies the law of the Eleventh Circuit with respect to evidentiary issues and the standard applicable to a motion for judgment as a matter of law. See Retractable Tech., Inc. v. Becton, Dickinson and Co., 653 F.3d 1296, 1302 (Fed. Cir. 2011)("In reviewing evidentiary rulings and denials of motions for JMOL, we apply the law of the regional circuit . . . ."); Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1218 (Fed. Cir. 2006)(applying regional circuit law when reviewing a Daubert ruling).

Under Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party."  The Eleventh Circuit has instructed that Rule 50 motions "should be granted . . . when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action."  Howard v. Walgreen Co., 605 F.3d 1239, 1242 (11th Cir. 2010).  The Court "look[s] at the record evidence, drawing all inferences in favor of the nonmoving party."  Collado v. United Parcel Service, Co., 419 F.3d 1143, 1149 (11th Cir. 2005).

---

[4] Rembrandt contended that the Shore D issue was moot in light of the jury's verdict. However, after fully discussing the mootness issue with the parties, the Court decided to proceed with an alternative ruling for the reasons stated on the record.  (Tr. Trans.  Vol. XI at 12-52.)

III.    **DISCUSSION**

A.    <u>JJVC's Motion to Exclude Dr. Beebe's Shore D Testimony</u>

While Dr. Beebe's shifting testimony casts doubt on his credibility, for purposes of this Order, the Court will assume that Dr. Beebe testified truthfully on cross-examination.[5]  The Court will thus assume that, in his expert report and during his own direct examination, Dr. Beebe disclosed a different testing methodology than he actually performed.  The Court will also accept that Dr. Beebe tested a stack of an unknown number of "cut-up" quarter-contact lenses which measured 6 millimeters.  Finally, the Court will accept Dr. Beebe's testimony that, although it is important to good science to keep accurate records, Dr. Beebe has absolutely no record of his procedures.[6]

1.    <u>Rules 26 and 37</u>

Federal Rule of Civil Procedure 26(a) requires an expert witness to produce a report which contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2).  Moreover, Rule 26(e) states a party must supplement its expert report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e).  The Eleventh Circuit has explained that "the expert disclosure rule is intended to provide opposing parties reasonable

---

[5] Rembrandt has likewise stated that it relies on Dr. Beebe's "new" testimony rather than his expert report or his testimony on direct examination.

[6] In fact, the documentary record of Dr. Beebe's testing flatly contradicts the methodology he now says he actually used.

12

opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." <u>Reese v. Herbert</u>, 527 F.3d 1253, 1265 (11th Cir. 2008)(quotation omitted).

Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." <u>Mitchell v. Ford Motor Co.</u>, 318 F. App'x 821, 824 (11th Cir. 2009).

As the First Circuit has explained:

> The Advisory Committee notes to the 1993 amendments to [Rule 37] state that the harmlessness provision is intended "to avoid unduly harsh penalties in a variety of situations." Illustrative examples are late disclosures of a potential witness known to all parties, a trial witness already listed by the adverse party, or a witness on behalf of a pro se litigant ignorant of the requirement. These suggest a fairly limited concept of "harmless."

<u>Gagnon v. Teledyne Princeton, Inc.</u>, 437 F.3d 188, 197 (1st Cir. 2006); <u>see also</u> <u>Burney v. Rheem Mfg. Co.</u>, 196 F.R.D. 659, 692 (M.D. Ala. 2000) ("This commentary strongly suggests that 'harmless involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'") (quoting <u>Vance v. United States</u>, 182 F.3d 920 (6th Cir. 1999)).[7]

---

[7] When determining if a failure to disclose was substantially justified or harmless, courts consider, among other things: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing

Dr. Beebe's expert report is woefully deficient under Rule 26.  Rather than disclosing the basis for his opinions, Dr. Beebe's report describes a Shore D test that is completely different from the test he now states he actually performed.  In his expert report, Dr. Beebe stated that 24 "lenses were removed from their packaging and carefully stacked on a stainless steel ball."  (Doc. 265, ex. 2 at 46.)  The report further states that the stack of lenses was at least 2.54 millimeters thick.  (Id. at 47.)  Dr. Beebe confirmed these procedures during direct examination.   During cross-examination, however, Dr. Beebe stated that he had cut the 24 lenses into quarters and stacked an unknown number of these quarter lenses to a height of 6 millimeters.  (Tr. Trans. Vol. III at 247.)  He also explained

_____

the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC, —F. Supp. 2d—, 2012 WL 115601, at *7 (M.D. Fla. Jan. 14, 2012).

Rembrandt asserts that the Court should also consider whether there has been "bad faith or willfulness in failing to comply with the district court's order." (Doc. 274 at 6.)  The cases Rembrandt relies on, however, are in the context of a party that violates a court order prior to trial.  (See Doc. 274.)  The courts in those cases thus had the ability to ameliorate prejudice by extending deadlines, reopening discovery, or granting other relief (or, in some cases, there simply was no prejudice).  Unlike in those cases, however, because JJVC learned for the first time in the middle of trial that Dr. Beebe had not disclosed his testing procedures, the Court was left with few remedial options.  In this situation, sanctions may be appropriate even absent a showing of willfulness because the prejudice to JJVC was largely unavoidable.

Moreover, the Eleventh Circuit has affirmed the exclusion of expert witness testimony under Rules 26 and 37 without requiring a showing of bad faith.  See Mitchell, 318 F. App'x at 824 (affirming the exclusion of an expert who "did not fully disclose the bases of his expert opinions or supplement the disclosures when it became clear that his Rule 26 disclosures and deposition had not been sufficient"); Romero v. Drummond Co., 552 F.3d 1303, 1323 (11th Cir. 2008)(affirming exclusion where the expert's report did not state the "anticipated opinion with sufficient specificity to allow [the opposing party] to prepare for rebuttal or cross-examination"); see also Nelson v. City & County of San Francisco, 123 F. App'x 817, 819-20 (9th Cir. 2005)(showing that a district court may exclude evidence under Rule 37 without finding willful deception).

that, rather than placing them on a stainless steel ball, he stacked the lenses on an aluminum plate.  (Id. at 249.)  Dr. Beebe thus employed drastically different  testing procedures than those disclosed in his expert report.

Rembrandt asserts that Dr. Beebe merely made "minor mistakes" when reporting his testing procedures. (Doc. 266 at 9.) This assertion is no more tenable than Dr. Beebe's claim that the problems in his expert report were due to a series of "typos."  In fact, the differences between the procedures listed in Dr. Beebe's reporting and those he testified to at trial are so substantial that Dr. Beebe essentially performed an entirely different test.  Rembrandt's failure to alert JJVC to the true nature of Dr. Beebe's testing was thus a blatant violation of Rule 26.

The Court recognizes that Rule 26 "does not limit an expert's testimony simply to reading his report.  The Rule contemplates that the expert will supplement, elaborate upon, and explain his report in his oral testimony." Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc., 493 F.3d 160, 167 (D.C. Cir. 2007)(quotation omitted).  This case, however, is easily distinguishable from those where courts have allowed an expert to vary from his expert report.  In McPherson v. Rowe, 366 F. App'x 43 (11th Cir. 2010), for example, the Eleventh Circuit held that the district court did not abuse its discretion by failing to exclude expert testimony regarding certain new information that had not been disclosed in an expert report because "neither of the [expert] witnesses testified to opinions based on the 'new information.'" Id. at 45.  Here, rather than permissibly elaborating on or supplementing his analysis, Dr. Beebe disclosed an entirely new testing protocol that formed the basis for his expert opinion.  This Rule 26 does not allow.

15

Rembrandt's failure to disclose cannot be "substantially justified." Fed. R. Civ. P. 37(c)(1). Rembrandt produced Dr. Beebe's expert report to JJVC on October 3, 2011. Since that time, Dr. Beebe has been deposed (on other aspects of his Shore D testing) and JJVC has moved for summary judgment based on Dr. Beebe's Shore D testing methodology. (Doc. 152.) Throughout the pretrial proceedings, Dr. Beebe thus apparently either did not review his expert report or forgot how he had actually performed the test. There is simply no excuse for Dr. Beebe waiting until cross-examination to disclose his testing procedures, and Rembrandt has not attempted to offer any explanation or justification.

However, Rembrandt contends that sanctions should not be imposed because its failure to disclose was harmless. Rembrandt asserts that JJVC suffered no prejudice for three reasons: (1) "JJVC paid no attention to Dr. Beebe's Shore D testing procedures until its cross-examination of Dr. Beebe;" (2) "not a single one of JJVC's experts reported making any effort whatsoever to duplicate Dr. Beebe's tests;" and (3) "Dr. Beebe's consistent results of zero are expected." (Doc. 266 at 8-12.)

Rembrandt's first contention is simply incorrect. JJVC moved for summary judgment and to exclude Dr. Beebe's testimony on the grounds that, "by failing to comply with the appropriate testing standards of ANSI and ASTM, Rembrandt generated results wholly unreliable under the standards of Daubert." (Doc. 152 at 38.) Although JJVC did not discuss Shore D testing procedures with Dr. Beebe during his deposition, JJVC was entitled to assume that Dr. Beebe had actually followed the procedures listed in his expert report.

Rembrandt's second contention is irrelevant. Although JJVC may not have attempted to duplicate the testing procedures listed in Dr. Beebe's expert report, JJVC was not given

the opportunity to duplicate the testing procedures actually used by Dr. Beebe. JJVC now asserts that, had it known of the procedures actually used by Dr. Beebe, it would have put on evidence showing that his new procedures were impractical and not in accordance with standards. (Tr. Trans. Vol. VI at 47.) Moreover, regardless of whether JJVC would have duplicated Dr. Beebe's testing, Rembrandt's failure to disclose Dr. Beebe's testing procedures until well into cross-examination obviously denied JJVC the ability to prepare for cross-examination. See, e.g., Thibeault v. Square D Co., 960 F.2d 239, 246-47 (1st Cir. 1992) ("Many courts . . . have recognized that the introduction of new expert testimony on the eve of trial can be seriously prejudicial to the opposing party."). This prejudice is demonstrated by the fact that, after Dr. Beebe concluded his testimony, JJVC informed the Court in its Daubert motion that Dr. Beebe's new procedures violated scientific standards in ways it had neglected to raise before the jury.[8]

Rembrandt next argues that JJVC suffered no prejudice because the accused lenses are "soft" under ordinary usage; however, this argument belies the nature of patent litigation. The plaintiff in an infringement case has the burden to prove that the defendant's product meets each and every claim limitation, *as defined by the Court*. At the joint request of the parties, the Court construed the "soft" limitation to mean "a contact lens having a Hardness (Shore D) of less than five." (Doc. 69 at 2.) As the Court ruled when Rembrandt raised this

---

[8] As more fully explained below in the Daubert discussion, the standards require that testing be performed at least three millimeters from any edge of the sample. By cutting the lenses in quarters, JJVC now argues that Dr. Beebe's samples were too small to comply with this requirement. Although JJVC raised this issue in its Daubert motion, it failed to do so before the jury. (Tr. Trans. Vol. IV at 80-81.)

17

issue in its motion in limine, common usage of the term "soft" is simply not relevant.  (See Doc. 255 at 95-96.)

Finally, Rembrandt contends that JJVC suffered no prejudice because, based on testing from other cases, Rembrandt believes the accused lenses have a Shore D value of less than five regardless of how they are tested.  (Doc. 266 at 8.)  However, to credit Rembrandt's argument, the Court would need to accept testing that was performed on different lenses in litigation to which JJVC was not a party.  This the Court cannot do.  Aside from Dr. Beebe's testimony in this case, neither the Court nor the jury had any way of knowing the Shore D value of JJVC's lenses.  Moreover, JJVC is entitled to put Rembrandt to its proof with respect to each claim limitation, and Rembrandt's failure to disclose Dr. Beebe's testing procedures seriously impaired JJVC's ability to do so.

JJVC also suffered prejudice during closing arguments.  Rather than attempt to defend Dr. Beebe's science, Rembrandt told the jury to ignore the problems with his testimony and methodology because "the expected value of any kind of testing on the Shore D is zero."  (Tr. Trans. Vol. IX at 187.)  Rembrandt told the jury: "it doesn't matter how you stack them, where you test them, the result is zero."  (Id.)  Rembrandt thus intimated that the jury could disregard Dr. Beebe's testing and still find that the accused products met the "soft" claim limitation.  But, of course, Dr. Beebe's testing was the only evidence that Rembrandt offered on this issue.

While Rembrandt has cited a number of cases in which courts have decided not to exclude expert testimony when faced with a violation of Rule 26, each of those cases is easily distinguishable because none involved a disclosure of new testing procedures in the

18

middle of trial.  See, e.g., McClain v. Metabolife Int'l, Inc., 193 F. Supp.2d 1252 (N.D. Ala. 2002); Graphic Packing Int'l, Inc. v. C.W. Zumbiel Co., No. 3:10-cv-891-J-37JBT, 2011 WL 5357833 (M.D. Fla. Nov. 3, 2011).  While a failure to comply with disclosure deadlines may be harmless in certain situations when the disclosure is ultimately made well before trial, the situation here is markedly different.  Unlike in those cases, the Court could not simply extend a deadline or amend the case schedule to cure the prejudice to JJVC.[9]

The Court "acknowledge[s] that preclusion of expert testimony is a grave step, not to be undertaken lightly."  Thibeault, 960 F.2d at 247.  However, Dr. Beebe performed an entirely different test than that disclosed in his expert report, and Rembrandt's failure to disclose this fact was a clear and unjustified violation of Rule 26.  Because this failure seriously prejudiced JJVC's defense, Dr. Beebe's Shore D testimony is due to be excluded under Rule 37.

2.     Daubert

JJVC also contends that Dr. Beebe's testimony regarding Shore D should be excluded under Daubert.  JJVC asserts that Dr. Beebe is not qualified to testify with respect to Shore D testing and his testing methodology is unreliable.  According to JJVC, Dr. Beebe's methodology is unreliable both because it does not comply with scientific standards and because it is not recorded and thus his tests are not reproducible.  (Doc. 265 at 17-24.)

---

[9] Rembrandt contends that "[t]he prejudice to JJVC was resoundingly cured by Mr. Diskant's [JJVC's counsel] withering cross-examination."  (Doc. 274 at 8).  However, Rembrandt has cited no authority for this argument, and the Court finds that it is not well taken.  As explained above, Dr. Beebe's failure to properly disclose his procedures impaired JJVC's ability to adequately prepare for cross-examination.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.   In

Daubert, the Supreme Court instructed that, under Rule 702, district courts must perform a

"gatekeeping" role with respect to expert scientific testimony and must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), cert. denied, 544

U.S. 1063 (2005).  When evaluating whether an expert's methodology is reliable, the Court

considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

Frazier, 387 F.3d at 1262.

"The burden of laying a proper foundation for the admissibility of an expert's testimony

is on the party offering the expert, and the admissibility must be shown by a preponderance

of the evidence."  Hall v. United Ins. Co. of America, 367 F.3d 1255, 1261 (11th Cir.

2004)(citation omitted).  The admission of expert testimony is a matter within the discretion

of the district court, which is accorded "considerable leeway" in making its determination.

Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1103 (11th Cir.

2005); Frazier, 387 F.3d at 1258-59.

Rembrandt first argues that Dr. Beebe's testimony should not be excluded because

"the weight and credibility of an expert's testimony are questions to be resolved by the jury." (Doc. 266 at 10.)  Rembrandt thus accepts the new methodology Dr. Beebe described during his cross-examination and disclaims the methodology listed in Dr. Beebe's expert report. (Id.)   As explained above, for purposes of this Order, the Court likewise assumes that Dr. Beebe testified truthfully at trial during cross-examination.

The Court will also assume, without deciding, that Dr. Beebe is sufficiently qualified to testify regarding Shore D testing and that his opinions, if reliable, would assist the jury. However, even accepting Dr. Beebe's testimony as true, Rembrandt has not met its burden of proving that Dr. Beebe's methodology is sufficiently reliable.

During oral argument, Rembrandt repeatedly asserted that Dr. Beebe's testing was reliable because "his test *results* are reliable."  (Tr. Trans. Vol. VI. at 64, 75, 79, 85.)[10] Rembrandt  thus essentially argues that Dr. Beebe's testimony should be allowed so long as the Court concludes that his results are correct.  Daubert, however, does not ask courts to evaluate whether an expert's opinion is correct; instead, it requires courts to determine whether the expert has used a reliable *methodology*.  See, e.g., Smelser v. Norfolk Southern Railway Co., 105 F.3d 299, 303 (6th Cir. 1997) ("When considering reliability, the trial court must focus on the soundness of the expert's methodology and not the correctness of his conclusions.").  That Dr. Beebe's ultimate opinion may be consistent with the expected result is not relevant to the issue of whether he employed a scientifically reliable methodology to

---

[10] To support this assertion, Rembrandt again refers to the common usage of the term "soft" and  testing Dr. Beebe performed on *other* contact lenses in litigation against *other* companies.

reach his opinion.  Just as a court need not accept opinions that are "connected to existing data only by the *ipse dixit* of the expert," General Electric v. Joiner, 522 U.S. 136, 146 (1997), this Court cannot simply accept the bald assertion that JJVC's lenses have a Shore D value of less than five.  As the Eleventh Circuit has explained, district courts must conduct "an exacting analysis of the *foundations* of expert opinions."  Frazier, 387 F.3d at 1260 (emphasis in original).

Rembrandt also asserts that Dr. Beebe's methodology is reliable because it complies with the ASTM standards for Shore D testing.  (Doc. 266 at 6.)  Dr. Beebe's procedures, however, significantly depart from those standards.  For example, the ASTM standards state that "[t]he lateral dimensions of the specimen shall be sufficient to permit measurements at least 12.0 mm (0.48 inch.) from any edge, unless it is known that identical results are obtained when measurements are made at a lesser distance from an edge." (Doc. 265, ex. 8 at 5.)  Moreover, the ANSI standards, which Dr. Beebe stated he did not read,[11] provide that measurements must be made at least 3 mm from any edge.  Because Dr. Beebe cut his sample lenses into quarters, however, it is mathematically impossible that he complied with either standard.  His samples were simply too small.  Moreover, the ASTM standards provide that "[t]he specimen shall be suitably supported to provide for positioning and stability." (Doc. 265, ex. 8 at 5.)  However, Dr. Beebe's protocol, as he explained it at trial, nowhere

---

[11] Dr. Beebe stated: "I can't recall whether I looked at the ASTM or the ANSI.  The acronyms are similar.  I looked at *one* of the standards." (Tr. Trans. Vol. III at 237.)  He later stated that he had consulted the ASTM standards.

mentions how the quarter-lenses were stacked or supported.[12]  Finally, while the ASTM

standards state that "a specimen may be composed of plied pieces to obtain the necessary

thickness," it warns that "determinations made on such specimens may not agree with those

made on solid specimens."  (Doc. 265 at ex. 8.)[13]  In sum, even accepting Dr. Beebe's

testimony as true, his testing contained serious deviations from the applicable scientific

standards.

Not only did Dr. Beebe depart from generally accepted scientific standards, his

methodology is also unreliable because he failed to keep proper records and documentation

of his procedures.  Under Daubert, courts must ensure that an expert "employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in

the relevant field." Frazier, 387 F.3d at 1260.  As Dr. Beebe stated at trial, experts in his field

record their methodology so that other scientists can reproduce and test their experiments.

(Tr. Trans. Vol. IV at 37, 44-45.)  In fact, reproducible testing is a hallmark of reliable

science.  See, e.g., Daubert, 509 U.S. at 593 ("Scientific methodology today is based on

generating hypotheses and testing them to see if they can be falsified; indeed, this

---

[12] The standard operating procedures provided in Dr. Beebe's expert report also fail to indicate how the samples were supported.  (See Doc. 266, ex. 2 at 46.)

[13] The ANSI standards state that "a test specimen consists of a contact lens button or blank that has the dimension of a disc of at least 6 mm thick and a diameter of at least 12.7mm."  When asked about this provision on cross-examination, Dr. Beebe implausibly suggested that there may be a comma missing from the standard, such that it permitted the testing of a "contact lens **[ , ]** button or blank."  Dr. Beebe's inability to provide any justification for his clear departure from the ANSI standards cuts against the reliability of his work.  While the ASTM standards are more supportive of his methodology, Dr. Beebe seemed totally unaware of this fact throughout cross-examination.

methodology is what distinguishes science from other fields of human inquiry.")(quotation omitted); <u>Zenith Electronics Corp. v. WH-TV Broadcasting Corp.</u>, 395 F.3d 416, 419 (7th Cir. 2005)("Someone else using the same data and methods must be able to replicate the result."). Dr. Beebe's testing, however, was not reproducible because he failed to document and disclose the procedures he used to conduct his tests.[14] This lack of documentation strongly weighs against the reliability of Dr. Beebe's methodology.  <u>See</u> <u>Smelser</u>, 105 F.3d at 303 (testimony improperly admitted where expert had "failed to adequately document testing conditions and the rate of error so the test could be repeated and its results verified and critiqued"); <u>United States v. Hebshie</u>, 754 F. Supp.2d 89,125 (D. Mass. 2010)("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of science."); <u>Morehouse v. Louisville Ladder Group LLC</u>, No. Civ.A 3:03-887-22, 2004 WL 2431796, at *7 (D. S.C. 2004)(excluding expert testimony in part because the expert "failed to record his hypothesis testing or include relevant details in his report"); <u>Black v. Rhone-Poulenc, Inc.</u>, 19 F. Supp.2d 592, 598 (S.D. W. Va. 1998)(finding that an expert's failure to document his study weighed against admissibility because "independent reconstruction would be exceedingly difficult if not impossible.").

The Court thus concludes that Dr. Beebe's methodology is not scientifically reliable. His testing procedures are undocumented and do not conform to the governing scientific standards.  The Court would be abdicating its gatekeeping role if it allowed the jury to rely on Dr. Beebe's opinion.  Dr. Beebe's Shore D testimony is thus due to be excluded under

---

[14] This is because, as previously discussed, Dr. Beebe's laboratory records and expert report describe an entirely different testing regimen.

Daubert as well as Rule 37.

>   3.   Summation

While the Court has analyzed the Shore D  issue as Rules 26 and 37 and Daubert require, this recitation may not capture the full import of what happened.  Dr. Bebee provided the only evidence of an essential element of Rembrandt's infringement case.   In the discipline of testing contact lenses, where measurements are often made in millimeters and the slightest variation in methodology can make a significant difference, Dr. Bebee tendered his Rule 26 report stating his method for conducting the Shore D test.  He then testified consistent with his report on direct examination and even for part of cross-examination.  It was only when he was repeatedly challenged on cross-examination concerning flaws in his method that he, on the fly, completely changed his testimony as to how he conducted the Shore D test.  In doing so, he gave explanations that bordered on the fanciful, such as that virtually the entire testing method he disclosed in his expert report was a "typo".

JJVC was left without the ability to effectively cross-examine Dr. Bebee on this "new" testing methodology he had just announced.  The jury, tasked with the Herculean challenge of deciphering the highly technical evidence in this patent case, was entirely disserved by the expert's sudden change in course.   Instead of the orderly and fair trial process contemplated by Rule 26 and Daubert, Dr. Bebee's abrupt and still unexplained implosion led to derailment of the trial as to this issue.  Rule 26, Rule 37 and Daubert, as applied to these egregious facts, compel the striking of Dr. Beebe's Shore D testimony.

>   B.   JJVC's Rule 50(a) Motions

>>   1.   Dr. Beebe's Shore D Testimony

Dr. Beebe's Shore D testimony constitutes the only evidence advanced by Rembrandt to prove that the accused JJVC products meet the "soft" claim limitation.  Once Dr. Beebe's testimony is excluded, no reasonable jury could find infringement.[15]  Pursuant to Rule 50(a), JJVC is therefore entitled to judgment as a matter of law.[16]

2.    Willfulness

The Court has also granted JJVC's Rule 50(a) motion with respect to the issue of willful infringement. The Federal Circuit has explained that,

> to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.  The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.

In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  "[B]oth legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent."  Black & Decker, Inc. v. Robert Bosch Tool Corp., 260 F. App'x 284, 291 (Fed. Cir. 2008).  Moreover, willfulness is not present where a claim term is susceptible to "a

---

[15] Rembrandt conceded this point at the May 11, 2012 hearing.  (See Tr. Trans. Vol. X at 19-20.)

[16] As stated on the record, the Court believes the motion is properly analyzed under Rule 50(a).  (Tr. Trans. Vol. XI at 15-52.)  However, if the motion is more properly brought under Rule 50(b), the Court's ruling would be the same.

reasonable construction" under which the defendant's products did not infringe. <u>Cohesive Technologies, Inc. v. Waters Corp.</u>, 543 F.3d 1351, 1374 (Fed. Cir. 2008).  "The answer to whether an accused infringer's reliance on a particular issue or defense is reasonable is a question for the court when the resolution of that particular issue or defense is a matter of law.  Should the court determine that the infringer's reliance on a defense was not objectively reckless, it cannot send the question of willfulness to the jury . . . ."  <u>Powell v. Home Depot U.S.A., Inc.</u>, 663 F.3d 1221, 1236 (Fed. Cir. 2011).

Rembrandt has not presented a legally sufficient evidentiary basis for a reasonable jury to find by clear and convincing evidence that JJVC acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. JJVC presented cogent and reasonable arguments that its products did not meet several limitations, including the "soft" and "surface layer" limitations.  Moreover, the Court finds that JJVC's reliance on its claim construction arguments and indefiniteness defenses was not objectively reckless.

Accordingly, it is hereby

**ORDERED**:

1.     Johnson & Johnson Vision Care, Inc.'s *ore tenus* motion to exclude evidence of Shore D testing and for judgment as a matter of law is **GRANTED**.

2.     Johnson & Johnson Vision Care, Inc.'s *ore tenus* motion for judgment as a matter of law on the issue of willful infringement is **GRANTED**.

3.     Pursuant to the jury's verdict (Doc. 277) and this Order, each of which shall constitute alternative bases, judgment will be entered in favor of defendant Johnson & Johnson Vision Care, Inc. and against plaintiff Rembrandt Vision Technologies, L.P.

**DONE AND ORDERED** at Jacksonville, Florida this 4th day of June, 2012.

TIMOTHY J. CORRIGAN
United States District Judge

js.
Copies:

counsel of record

28